*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0261**

State of Minnesota,
Respondent,

vs.

Tony Don,
Appellant.

**Filed February 17, 2015
Affirmed
Stauber, Judge**

Rice County District Court
File No. 66CR123392

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Minnesota; and

G. Paul Beaumaster, Rice County Attorney, Faribault, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Special Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hudson, Presiding Judge; Stauber, Judge; and Minge, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**STAUBER**, Judge

On appeal from his conviction of first-degree aggravated robbery, appellant argues that the district court (1) improperly allowed evidence of an overly suggestive identification of him at trial; (2) abused its discretion by allowing him to be impeached with his prior felony convictions that had no bearing on honesty; and (3) abused its discretion by sentencing him to an upward durational departure under Minn. Stat. § 609.1095 (2012). Appellant also filed a pro se supplemental brief claiming several instances of prosecutorial misconduct. We affirm.

**FACTS**

In December 2012, appellant Tony Don was charged with aggravated robbery in the first degree. The complaint alleged that appellant and an accomplice robbed a pedestrian at knife-point in Northfield.

Prior to trial, appellant moved to suppress the evidence of the victim's pretrial identification of appellant, arguing that the show-up identification of appellant was unfairly suggestive and unreliable. The district court denied the motion, concluding that the identification procedure was "unnecessarily suggestive," but that "it did not create a substantial likelihood of irreparable misidentification" because the "identification was based upon the distinctive tattoos."

At trial, evidence and testimony was presented establishing that at about 1:00 a.m. on December 11, 2012, J.H. realized that his car was parked on the street in violation of a winter parking ban. After moving his car to avoid being ticketed, J.H. decided to go for a

walk. According to J.H., it had started to snow, and he was listening to music through his headphones when he noticed two "suspicious" men "wearing bandanas around their faces." J.H. testified that he attempted to avoid the men, and when he did not see them anymore, he continued his walk. But when he rounded a corner, and turned around, he saw the two men with the heavy coats, hats, and bandanas, approaching him from around the corner, and one was "holding a knife."

The man identified as appellant demanded that J.H. "give him what [he] had," and J.H. gave him his iPod and cell phone. He also gave him a "pile of cards" that he keeps in his front pocket in lieu of a wallet, which included his driver's license and a credit and debit card. According to J.H., appellant looked at his driver's license and warned J.H. that he would remember him and come after him if he went to the police. Appellant also demanded money, so the group went to a nearby ATM where J.H. withdrew $300 and gave it to the robbers. The two men then left heading north.

After the men were out of sight, J.H. ran to a friend's house where he called 911 to report the robbery. Northfield police were then able to find footprints in the snow and followed them until they located appellant and C.W. at the rear of a private residence. When police detained appellant and C.W., they were not "appropriately attired for the weather," wearing only shirts and long pants. The men were subsequently arrested and brought to J.H. to see if he could identify them. C.W. was taken out of a squad car first and shown to J.H. J.H. was unable to identify C.W. because he was not wearing a jacket and had no distinguishing features. But J.H. was able to identify appellant because of the tattoos around his eyes.

3

A jury found appellant guilty of aggravated first-degree robbery. After hearing additional testimony, the jury also found that appellant was a danger to public safety as defined by Minn. Stat. § 609.1095, subd. 2. The district court then sentenced appellant to 168 months, a duration double the low end of the presumptive sentencing range for aggravated robbery in the first degree with appellant's criminal-history score of five. Appellant moved for a new trial, which was denied. This appeal followed.

## D E C I S I O N

### I.

The admission of pretrial-identification evidence violates a defendant's right to due process if the procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Booker*, 770 N.W.2d 161, 168 (Minn. App. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968)). While evidentiary decisions are generally reviewed for an abuse of discretion, we review de novo whether the admission of pretrial-identification evidence denied a defendant due process. *State v. Hooks*, 752 N.W.2d 79, 83 (Minn. App. 2008).

A two-part test is used to determine whether pretrial-identification evidence is reliable. *In re Welfare of M.E.M.*, 674 N.W.2d 208, 214-15 (Minn. App. 2004). "First, the procedure producing the identification is evaluated to determine if it was unnecessarily suggestive. Second, if the procedure is unnecessarily suggestive, the court then considers whether the totality of the circumstances created a substantial probability that the defendant was misidentified." *Id.* The Minnesota Supreme Court has articulated five factors to evaluate the totality of the circumstances: (1) the opportunity of the

witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness; and (5) the time between the crime and the confrontation. *State v. Ostrem*, 535 N.W.2d 916, 921 (Minn. 1995) (citing *State v. Belcourt*, 312 Minn. 263, 264, 251 N.W.2d 631, 633 (Minn. 1977)).

Appellant argues that the district court erred by allowing evidence of the overly suggestive identification because the five factors, which were not analyzed by the district court, weigh in favor of suppressing the identification. We disagree. The record reflects that the victim had several minutes to view the suspects at close range. Moreover, although the suspects were dressed for winter, with heavy coats, hats, and bandanas on their faces, J.H. had enough opportunity to observe tattoos around appellant's eyes. And, the high degree of detail that was reflected by the victim's trial testimony demonstrates that he was very attentive during the robbery. Thus, the first two *Ostrem* factors indicate that the identification was reliable.

The fourth and fifth factors also indicate that the identification was reliable. The victim identified appellant less than an hour after the commission of the robbery. *See Ostrem*, 535 N.W.2d at 922 (concluding that unnecessarily suggestive identification procedure was nonetheless reliable where, among other things, it occurred "only 48 hours after the crime"). And although J.H. did not positively identify appellant, he stated that he was "fairly certain" that appellant was one of the robbers. This certainty was based upon the distinctive tattoos around appellant's eyes, which were not covered by the bandana.

Finally, the only factor that arguably weighs against a finding that the identification was reliable is the third factor—the accuracy of appellant's prior description of the suspects. As appellant points out, the record reflects that the victim never mentioned the tattoos around appellant's eyes during the 911 call and told the operator that the robbers were wearing hats, coats, and bandanas. But when presented for the show-up, neither suspect was wearing a coat or bandana. Nonetheless, the fact that appellant did not have a coat, hat, or bandana when he was arrested does not suggest that the victim's prior description was inaccurate. Rather, because it was cold and snowing at the time he was arrested, the lack of a coat or hat is highly suspicious and suggests that appellant disposed of those items before he was apprehended. Moreover, when J.H. identified appellant as one of the robbers, he specifically did so based on the tattoos around appellant's eyes, which were visible despite the bandana. Therefore, based on the totality of the circumstances, any suggestiveness in the show-up procedure did not create a substantial likelihood of irreparable misidentification.

## II.

Appellant challenges the district court's decision to allow the state to impeach him with his three prior felony convictions. We review the district court's decision as to whether a witness can be impeached by evidence of a prior conviction for an abuse of discretion. *State v. Hill*, 801 N.W.2d 646, 651 (Minn. 2011). Appellant has the burden of showing that the district court improperly admitted the evidence and that he was prejudiced as a result. *State v. Ness*, 707 N.W.2d 676, 685 (Minn. 2006). The reviewing court will reverse the conviction only if the district court's erroneous admission of

6

evidence substantially influenced the jury's decision. *State v. Jackson*, 770 N.W.2d 470, 482 (Minn. 2009).

Minn. R. Evid. 609(a) provides that a witness's credibility may be attacked by evidence of a conviction of any crime of dishonesty or of a felony, if the probative value of using this evidence outweighs its prejudicial effect. Generally, "[e]vidence of a conviction . . . is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date." Minn. R. Evid. 609(b). The district court should make explicit findings supporting its impeachment decision, but a reviewing court may independently review the record to determine if the district court abused its discretion. *State v. Craig*, 807 N.W.2d 453, 469 (Minn. App. 2011), *aff'd*, 826 N.W.2d 789 (Minn. 2013); *State v. Vanhouse*, 634 N.W.2d 715, 719 (Minn. App. 2001), *review denied* (Minn. Dec. 11, 2001); *see also* Minn. R. Evid. 609(a) 1989 comm. cmt. (stating that district court "should make explicit findings on the record as to the factors considered and the reasons for admitting or excluding the evidence").

In order to determine whether the probative value of the evidence outweighs the prejudicial effect of impeaching a witness with a prior felony conviction, the district court is directed to consider the *Jones* factors. *See State v. Jones*, 271 N.W.2d 534, 537-38 (Minn. 1978). These factors include:

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of the

7

defendant's testimony, and (5) the centrality of the credibility
issue.

*Id.* at 538.

Here, the district court ruled that if appellant testified, the state could impeach him with his three prior felony convictions: a third-degree assault conviction from April 2005, and two aggravated first-degree robbery convictions from 2008. But the district court limited the evidence to the date and county of the convictions and the fact that each conviction was an adult felony conviction.

Appellant argues that the district court erred by allowing the state to impeach him with his three prior felony convictions "that were not probative of dishonesty." Appellant contends that the improper impeachment contributed to his conviction and, therefore, his conviction must be reversed.

### A.  Impeachment value

Minnesota courts have consistently held that even crimes not involving dishonesty have impeachment value because "impeachment by a prior conviction aids the jury by allowing it to see the whole person and thus to judge better the truth of the defendant's testimony." *Craig*, 807 N.W.2d at 469 (quotation omitted). And the supreme court has recognized that permitting the jury to see the "whole person" aided it in evaluating the veracity of the defendant's testimony. *State v. Williams*, 771 N.W.2d 514, 518 (Minn. 2009).

Appellant argues this his prior convictions had limited impeachment value because "[w]hen the jury heard testimony that [he] had been convicted of an unspecified felony

there was no way the jury could consider the kind of crime and how it related to [appellant's] honesty." In making his argument, appellant argues that this court should reject the "whole person" theory of impeachment. But in *State v. Hill*, 801 N.W.2d 646, 652 (Minn. 2011), the supreme court affirmed that "*any* felony conviction is probative of a witness's credibility." And it is not the role of this court to overturn established supreme court precedent. *State v. Ward*, 580 N.W.2d 67, 74 (Minn. App. 1998). Appellant's prior conviction had impeachment value because it permitted the jury to consider appellant as a "whole person." This factor weighs in favor of admission.

**B.    Date**

Under Minn. R. Evid. 609(b), convictions that are more than ten years old generally cannot be used to impeach. Two of appellant's convictions were only four years old, and the third conviction was seven years old. Thus, this factor also weighs in favor of admission.

**C.    Similarity**

A prior conviction that is similar to the current offense generally weighs against use of the prior conviction for impeachment purposes because of the possibility that a jury may use the information substantively. *See State v. Gassler*, 505 N.W.2d 62, 67 (Minn. 1993). The state acknowledges that "[b]ecause the charged crime here is similar to appellant's past convictions, this factor weighs against admission of those past convictions." But as the state points out, the district court excluded any evidence of the specific nature of appellant's prior convictions, which would eliminate any potential prejudice to appellant arising from the similarity of those convictions to the present

9

offense.  Moreover, the record reflects that the district court cautioned the jury twice about the limited purpose of appellant's prior felony convictions.  *See State v. Brouillette*, 286 N.W.2d 702, 708 (Minn. 1979) (recognizing that a cautionary instruction "adequately protects [a] defendant against the possibility that the jury would convict him on the basis of his character rather than his guilt").  Consequently, the risk was minimal that the jury considered appellant's prior convictions as substantive evidence of his guilt.

### D.     Importance of testimony

The importance of the defendant's testimony weighs against use of the impeachment evidence if it discourages the defendant from testifying.  *Gassler*, 505 N.W.2d at 67.  But here, appellant testified despite the district court's decision to admit appellant's prior convictions for impeachment.  This factor weighs in favor of admissibility.  *See id.* (noting that if a fact-finder hears the defendant's version of the events, this factor weighs in favor of admissibility).

### E.     Credibility

The fifth factor weighs in favor of the admission of the prior convictions if credibility is the central issue in the case.  *State v. Swanson*, 707 N.W.2d 645, 655 (Minn. 2006).  Here, credibility was the central issue.  Although J.H. identified appellant as one of the robbers, he was only "fairly certain" of the identification because the bandana partially concealed the robber's face.  To support the victim's testimony, the state offered the testimony of the accomplice, C.W., who claimed that both he and appellant committed the robbery.  Appellant, however, testified in his defense and claimed that C.W. was lying and that appellant did not take part in the robbery.  Therefore, because

10

credibility was the central issue, there was a "significant need for the admission of [the impeachment] evidence." *Gassler*, 505 N.W.2d at 67.

After considering all of the *Jones* factors, we conclude that the district court did not abuse its discretion by allowing the state to impeach appellant with his prior felony convictions. And although appellant claims that the district court did not properly consider the *Jones* factors, the record reflects that the court did consider these factors. In fact, when ruling not to allow the state to designate the offenses of which appellant had been convicted, the district court stated: "So I think under the *Jones* factors that factor number three outweighs the rest and will only allow undesignated offenses to use for impeachment." And to the extent that the district court failed to make a complete record of its analysis of the *Jones* factors, any error was harmless. *See Swanson*, 707 N.W.2d at 654-55 (holding that the district court's failure to make a record of its analysis of the *Jones* factors was harmless where only one of the *Jones* factors weighed against admission of the defendant's prior convictions as impeachment evidence).

### III.

We review the district court's decision to depart from the presumptive sentence for an abuse of discretion. *Tucker v. State*, 799 N.W.2d 583, 585-86 (Minn. 2011). We will reverse a sentence if the district court's reasons for departure are "improper or inadequate," or if the evidence is not sufficient to justify the departure. *Id.* at 586 (quotation omitted).

"The dangerous-offender statute is a sentencing statute that permits durational departures not otherwise authorized by the sentencing guidelines." *Neal v. State*, 658

11

N.W.2d 536, 545 (Minn. 2003). If the requirements of Minn. Stat. § 609.1095, subd. 2, are met, the district court may impose an upward durational departure up to the statutory maximum, even in the absence of severe aggravating factors. *Id.* The statutory requirements are: (1) the offender was at least 18 years old at the time the felony was committed; (2) the offender had two or more prior convictions for violent crimes; and (3) the fact-finder determines that the offender is a danger to public safety. Minn. Stat. § 609.1095, subd. 2; *Neal*, 658 N.W.2d at 543. The fact-finder may base a finding of danger to public safety on the "offender's past criminal behavior, such as the offender's high frequency rate of criminal activity . . . or long involvement in criminal activity." *Id.*

Under Minn. Stat. § 609.1095, subd. 1(c), a prior conviction for the dangerous offender statute "means a conviction that occurred before the offender committed the next felony resulting in a conviction and before the offense for which the offender is being sentenced under this section." Citing this provision, appellant initially contends that his three prior adult felony convictions were improperly used to support the departure because the second first-degree aggravated robbery occurred before he was convicted and sentenced for the first aggravated first-degree robbery offense.

The state does not quibble with appellant's position that all three prior adult felony convictions should not have been used to support the upward departure. But the state correctly points out that "[e]ven assuming that appellant is correct, he still had two qualifying prior convictions: his third-degree assault conviction on April 30, 2005, and his more recent aggravated robbery conviction on September 30, 2008."

12

Appellant also contends that his sentence was improper because the sentencing court considered his criminal history three times: (1) to calculate his presumptive sentence; (2) to determine that he had two or more prior violent-crime convictions; and (3) to support the jury's special interrogatory finding him to be a danger to public safety. But the statute explicitly allows the district court to sentence appellant in the manner that it did. Appellant does not challenge the constitutionality of the statute, but instead appears to challenge the policy behind the statute. As the state points out, such a challenge should be brought before the legislature because it is outside the purview of this court as an error-correcting court. *See Lake George Park, L.L.C. v. IBM Mid-America Emps. Fed. Credit Union*, 576 N.W.2d 463, 466 (Minn. App. 1998) (stating that "[t]his court, as an error correcting court, is without authority to change the law"), *review denied* (Minn. June 17, 1998).

The record reflects that appellant was older than 18 when he robbed the victim at knifepoint, and appellant has two prior convictions for violent crimes: a conviction of third-degree assault and a conviction of aggravated first-degree robbery. Moreover, the jury found that appellant is a danger to public safety due to his past criminal behavior, which includes factors such as his high frequency rate of criminal activity or long involvement in criminal activity. These factors satisfy all of the criteria set forth in the dangerous offender statute. The district court then sentenced appellant to 168 months, a duration twice the low end of the presumptive sentencing range for aggravated robbery in the first degree committed by an offender with a criminal-history score of five. Accordingly, the district court did not abuse its discretion when it sentenced appellant.

13

## IV.

Appellant filed a pro se supplemental brief arguing several instances of prosecutorial misconduct. "When a defendant fails to object to prosecutorial misconduct at trial, he ordinarily forfeits appellate consideration of the issue." *State v. Caine*, 746 N.W.2d 339, 358 (Minn. 2008) (quotation omitted). But we may review such conduct under the plain error doctrine. *Id.* In the context of unobjected-to prosecutorial misconduct, once error is shown, the burden is on the state to demonstrate that its plainly erroneous misconduct "did not prejudice the defendant's substantial rights." *State v. Ramey*, 721 N.W.2d 294, 299-300 (Minn. 2006).

Appellant claims that the state pressured the accomplice to testify in a certain way by stating that "something is going to happen to him if he doesn't say a certain thing." But in *Opsahl v. State*, the supreme court held that the state's warnings about the consequences of committing perjury, even when inaccurate, are not necessarily prejudicial. 710 N.W.2d 776, 783 (Minn. 2006). The accomplice testified that he was obligated to testify under the terms of a plea agreement and that if he did not "say a certain thing" he was going to prison. The accomplice also testified that he was obligated to testify truthfully. There was no prosecutorial misconduct concerning the accomplice's testimony.

Appellant also complains about the accomplice approaching the prosecutor during a recess and stating that he wanted to correct his testimony. Appellant appears to indicate that the accomplice's desire to change his testimony was a product of the prosecutor's intimidation of the witness. But as addressed above, the prosecutor did not commit

14

misconduct during the accomplice's testimony.  And a review of the record reveals that the accomplice simply explained that he did "recall [that] I did grab the money from the victim and I handed it to [appellant].  And I wanted to correct that."

Appellant further argues that there was an irregularity in the court proceedings because a recording of an officer's interrogation of the accomplice was edited by the state before it was played to the jury.  But as the district court found in its order denying appellant's motion for a new trial, the tape was edited because it referenced appellant's prior aggravated robbery offense.  As the district court found, if the tape had been played in its entirety, it would have been "severely" prejudicial to appellant.  Therefore, appellant is unable to establish that the prosecutor committed misconduct at trial.

**Affirmed.**